UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | | |
|---|---|---|
| SHANE BALLOU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 2:25-cv-908 |
| | ) | |
| DARTMOUTH-HITCHCOCK MEDICAL CENTER, DARTMOUTH-HITCHCOCK CLINIC, MARY HITCHCOCK MEMORIAL HOSPITAL, and DARTMOUTH-HITCHCOCK HEALTH, | ) ) ) ) ) ) ) ) | Jury Trial Demanded |
| | ) | |
| Defendants. | ) | |

# COMPLAINT

Plaintiff Shane Ballou brings these claims against Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Dartmouth Health") to recover damages and other appropriate relief for the harm caused by Dartmouth Health's failure—multiple times over the course of nearly a week—to accommodate his hearing disability while his son was in hospital dying of traumatic brain injuries.

JURISDICTION AND PARTIES

1. Shane Ballou ("Mr. Ballou") is a deaf individual who resides in West Dover, Vermont.

2. Dartmouth-Hitchcock Health is a New Hampshire nonprofit corporation located in Lebanon, New Hampshire. Dartmouth-Hitchcock Health operates a healthcare delivery system throughout Vermont and New Hampshire under the trade name Dartmouth Health.

3. Defendants Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Medical Center are each New Hampshire nonprofit corporations, located in Lebanon, New Hampshire, and members of the Dartmouth Health system.

4. The events described in this Complaint took place between December 9, 2024, and December 13, 2024, in Lebanon, New Hampshire and West Dover, Vermont.

## FACTS

5. Mr. Ballou has been deaf his entire life.

6. His first and primary language is American Sign Language ("ASL"). ASL is not simply signed English, but a separate language with its own syntax.

7. English is Mr. Ballou's second language. Mr. Ballou can read and write a small amount of English. His speech is difficult to understand.

8. Mr. Ballou has five children, all of whom are not deaf.

9. Mr. Ballou's twenty-four year old son, Shane Whitaker Jr., was struck by a truck on December 9, 2024.

10. Shane's injuries were severe and ultimately fatal. He was transported to Grace Cottage Hospital in Townshend, Vermont, and then transferred to Dartmouth Health's intensive care unit ("ICU") at Dartmouth-Hitchcock Medical Center in Lebanon, New Hampshire. He never regained consciousness.

11. Mr. Ballou arrived at the ICU at approximately 9:00 pm on December 9, 2024. Upon arrival, he verbally requested an in-person ASL interpreter.

12. With Shane unconscious, Mr. Ballou was responsible for making medical decisions on his son's behalf.

13. Mr. Ballou's daughter, Shalba Morel, arrived at the ICU shortly after Mr. Ballou.

14. At the time, Shalba was nine months pregnant.

15. Shalba also requested an in-person ASL interpreter for her father.

16. Shalba was told by the nurses that 1) due to hospital policy, no "medical information" could be communicated to a deaf individual without a qualified medical interpreter present; and 2) Dartmouth Health "had little to no" in-person interpreters available.

17. Under hospital policy, Mr. Ballou would be denied access to critical information about his son's condition and would not be able to make informed decisions about his son's care in the absence of an approved interpreter.

18. Dartmouth Health has access to directories of qualified ASL interpreters who provide in-person interpretation services upon request.

19. Mr. Ballou and Shalba stayed in the ICU with Shane through the night.

20. No in-person ASL interpreter was provided, although at some point, an iPad with Video Remote Interpreting[1] ("VRI") capability was handed to Mr. Ballou.

21. VRI requires a robust internet connection to operate effectively. The internet connection at Dartmouth Health was poor and, as a result, the interpreter's image on the iPad was often frozen or choppy and the interpreter kept missing parts of what the nurse or doctor was trying to explain. Mr. Ballou and Shalba both said to the nurse, "this is not working," and the nurse replied, "I know."

22. Each day, Mr. Ballou and Shalba asked for an in-person interpreter because the intermittent VRI service was insufficient to enable Mr. Ballou to effectively communicate with the medical professionals treating his son.

---

[1] VRI is an app that connects the deaf user with a remote sign language interpreter who interprets what is being said/signed in the room. It is a similar experience to using FaceTime on a handheld device.

23. Despite acknowledging that the VRI service was inadequate, Dartmouth Health did not provide a live ASL interpreter or arrange for a more stable internet connection.

24. Mr. Ballou was left in untenable limbo, unsure of the true extent of his son's condition or prognosis. Indeed, it was more than twelve hours before Mr. Ballou was able to learn anything substantial about his son's injuries, other than that they were severe.

25. Failure to provide an interpreter for a hospital patient where a language barrier presents a continuing problem to a patient's understanding of their care and treatment is a violation of the Vermont Patients' Bill of Rights.

26. As Shane was unconscious, Mr. Ballou had to stand in his shoes to make decisions about care and treatment.

27. On occasion, Shalba was able to approach staff on her own to get an update, after which she would return to her father and attempt to relay in ASL her interpretation of what she understood from the Dartmouth Health staff.

28. Although Shalba is experienced communicating in ASL, she is neither a medical professional nor a qualified medical interpreter with training in medical terminology. She was also understandably distraught about her brother's condition.

29. The extent to which she was able to effectively interpret all that was said to her under the circumstances is unknown, but in any event, her piecemeal translations were not the same as Mr. Ballou being able to receive information directly from the medical providers and ask questions in response, as hearing individuals could do (or as he could have done with a properly-functioning VRI or an in-person ASL interpreter).

30. Mr. Ballou and Shalba left the hospital at approximately 7:00 am on the morning of December 10, 2024. Mr. Ballou returned a few hours later by himself. Again, he tried to

communicate with the nursing staff. Again, the connection supporting the VRI iPad was insufficient to allow effective communication. Mr. Ballou complained about the inadequate communication and expressed his concern about how decisions were going to be made if he could not effectively understand what was happening and communicate with those caring for his son.

31. When Shalba rejoined her father that afternoon, Mr. Ballou and Shalba were again told that the nurses could not provide "medical updates" without an interpreter.

32. A doctor used VRI to try to explain the details regarding the severe nature of Shane's injuries (he was so badly injured that nothing medically could be done for him).

33. As a result of the poor VRI connection and the freezing image, the VRI interpreter (and consequently Mr. Ballou) missed large chunks of the information that the doctor was trying to provide.

34. During this exchange, Shalba was listening to the doctor speak and watching the screen and her father. Because Shalba is hearing and also able to communicate using ASL, it was clear to her that the information relayed by the interpreter was incomplete and confusing. From the questions that Mr. Ballou asked, Shalba could also tell that Mr. Ballou was struggling to understand and not getting the full picture of his son's condition.

35. Shalba felt compelled to step in and interpret for her father, which put her in the difficult position of explaining to her father the distressing and emotionally-charged news that her brother would not recover.

36. Mr. Ballou was upset about having to hear this devastating news from his heavily-pregnant daughter and increasingly frustrated by the lack of clear communication and the

challenge of trying to manage his daughter's distress and to make decisions on behalf of his son without sufficient information.

37. Mr. Ballou and Shalba stayed in the ICU for the remainder of the day on December 10, 2024, returning home in the late evening.

38. After he returned to his West Dover home, Mr. Ballou received a middle-of-the-night call from someone at Dartmouth Health.

39. Mr. Ballou uses the Video Relay Service ("VRS") to receive phone calls from hearing individuals. The caller apparently did not understand how to use the VRS and simply hung up instead of speaking through the interpreter.[2]

40. Dartmouth Health then contacted Shalba and said that her father needed to return to the hospital because there was a "change" in Shane's status. As a result of the call from Dartmouth Health, Mr. Ballou got in his car and drove roughly eighty miles to the hospital in the middle of the night.

41. Due to the winter weather conditions, it took Mr. Ballou far longer than the usual hour and a half to get to the hospital.

42. When Mr. Ballou arrived at the hospital in the early hours of December 11, 2024, he was asked by Dartmouth Health staff through VRI for permission to perform a craniotomy—a procedure to remove a portion of the skull.[3]

---

[2] The VRS is not difficult to use. The hearing user dials the deaf user's phone number and is connected to a VRS interpreter who then puts a video call through to the deaf individual. The hearing user speaks as normal, and their speech is relayed in ASL to the deaf user by the interpreter. The deaf user's signed response is then relayed orally to the hearing user. The users experience short delays during the translation process.

[3] In the end, this procedure was not performed for reasons that were unclear to Mr. Ballou.

43. This request could either have been made while Mr. Ballou was at the hospital the day before or by phone using the VRS system. Requiring Mr. Ballou to drive several hours to the hospital in bad weather and in the middle of the night was dangerous, callous, and completely avoidable.

44. Mr. Ballou and Shalba were also at the hospital for most of Thursday, December 12, where they continued to request an in-person interpreter due to the challenges of communicating through the unstable VRI app.

45. At one point on December 12, Mr. Ballou and Shalba went to get food in the hospital's food court. When they returned, staff told them that a live interpreter had come to the ICU but had been sent away when they were found not to be there. If Mr. Ballou had been told a live interpreter was coming, he would not have left the ICU to get food.

46. Mr. Ballou returned home to West Dover in the late evening on December 12, 2024. A few hours later, at 12:05 am, he received a call through the VRS system from Dartmouth Health, and again the caller hung up instead of using the VRS system. When Mr. Ballou called back, he was told to return to the hospital immediately because his son had become brain dead.

47. As a result of the call, Mr. Ballou and his daughter decided to immediately leave their homes to drive to the hospital despite the late hour and continued bad weather.

48. Due to the driving conditions, it was after 4:00 am on December 13, 2024, by the time Mr. Ballou and Shalba reached the ICU. Upon their arrival, staff apologized and said that there was no "real emergency," just the paperwork to fill out for organ donation. They were told to wait until the neurosurgeon could speak to them at 7:00 am.

49. For roughly four hours, Mr. Ballou and Shalba sat and waited until a neurosurgeon finally came to meet with them at 8:00 am.

50. Mr. Ballou asked to have a family friend who had joined them at the hospital interpret for him, but his request was denied due to hospital policy.

51. In this meeting, the neurosurgeon and two nurses used VRI to try to explain the process of removing Shane from life support. As expected, the interpreter repeatedly "froze" on the screen, leaving frequent gaps in the information conveyed.

52. Mr. Ballou was frustrated—because of the ineffective VRI interpreter, the lack of an in-person interpreter, and Dartmouth Health's refusal to allow him to bring his own interpreter, he had to rely on Shalba to translate during this emotional conversation about whether to continue his son's life support.

53. At approximately 9:00 am, the doctor and two nurses told Shalba that Dartmouth Health wanted to proceed to pull the life support for Shane. Shalba explained that their mother was currently driving up from Connecticut, and they needed to wait until she arrived.

54. At approximately 10:00 am on December 13, 2024—the fifth day of Shane's stay in the ICU—a live interpreter finally arrived.

55. Shane's mother arrived at about 11:00 am, and the staff proceeded to take Shane off life support. He died shortly thereafter.

56. Each day, Mr. Ballou and his daughter continued to ask for an in-person interpreter. Not until the last hour of Shane's life was one made available to him.

57. At no time from December 9, 2024, when Mr. Ballou arrived at Dartmouth Health, through December 13, 2024, when he left for the last time, did the VRI work properly.

Often, staff would simply give up trying to communicate with Mr. Ballou through the VRI and walk away.

58. On both occasions when the hospital called in the middle of the night and the caller hung up rather than communicate using the VRS system, Mr. Ballou and his heavily-pregnant daughter were unnecessarily forced to drive eighty miles in the middle of the night on dangerous winter roads.

59. From Monday night when Shane was admitted to the ICU until Friday morning when the decision was made to cease life support, Mr. Ballou was denied critical information about his son's condition and treatment.

## COUNT I

(Vermont Public Accommodation Act, 9 V.S.A. § 4500 *et seq.*)

60. Mr. Ballou repeats and incorporates the foregoing paragraphs.

61. It is unlawful under Vermont law for a place of public accommodation to discriminate against an individual with a disability or provide unequal access to "services, facilities, goods, privileges, advantages, benefits, or accommodations."

62. Dartmouth-Hitchcock Medical Center is a place of public accommodation.

63. Mr. Ballou is an individual with a disability.

64. Defendants had an obligation to ensure Mr. Ballou was able to communicate with hospital staff and his son's providers; to make reasonable modifications to their policies and practices as necessary; and to ensure that Mr. Ballou was not excluded, denied services, or otherwise treated differently than other visitors to the hospital because of a lack of auxiliary aids and services.

65. Defendants failed to meet their obligations. From the evening of December 9, 2024, until the morning of December 13, 2024, Defendants wrongfully and maliciously discriminated against Mr. Ballou by failing to provide in-person or functional remote interpretation services necessary for Mr. Ballou to communicate effectively with the providers and staff caring for his son or to make reasonable modifications to hospital policy to enable Mr. Ballou to provide his own interpreter if Defendants were unable to secure the services of a professional interpreter.

66. Defendants' actions and inactions caused harm to Mr. Ballou.

## COUNT II
### (ADA, Title III, 42 U.S.C. § 12181 *et seq.*)

67. Mr. Ballou repeats and incorporates the foregoing paragraphs.

68. Title III of the Americans with Disabilities Act prohibits discrimination on the basis of disability in places of public accommodation.

69. Places of public accommodation must make reasonable accommodations to facilitate "full and equal enjoyment."

70. Dartmouth-Hitchcock Medical Center is a place of public accommodation owned and/or operated by Defendants.

71. Mr. Ballou is an individual with a disability.

72. Defendants discriminated against Mr. Ballou when they repeatedly failed to obtain an interpreter or procure an effective alternative means of communication.

73. Mr. Ballou experienced harm as a result of Defendants' actions or inactions.

74. Mr. Ballou and other deaf individuals are likely to need services from Defendants in the future and will experience further discrimination and harm if Defendants do not take

steps to ensure the availability of appropriate auxiliary aids such as in-person ASL interpretation and provide additional training to providers.

## COUNT III
### (Section 504 of the Rehabilitation Act)

75. Mr. Ballou repeats and incorporates the foregoing paragraphs.

76. Section 504 of the Rehabilitation Act prohibits discrimination against persons with disabilities by recipients of federal funds. In providing health services, it is discriminatory to provide non-equal or less effective services or provide services in a manner that limits participation.

77. Defendants are recipients of federal funds and therefore subject to the Act.

78. Mr. Ballou is a person with a disability.

79. Defendants were required under the Act to 1) take appropriate steps to ensure that communications with "companions with disabilities" are as effective as communications with others and 2) furnish appropriate auxiliary aids and services where necessary.

80. Defendants unlawfully discriminated against Mr. Ballou when they limited his ability to understand and participate in his son's treatment by failing to provide effective communication services or auxiliary aids.

81. Defendants' actions and inactions harmed Mr. Ballou.

## PRAYER FOR RELIEF

For all of the reasons stated above, Plaintiff asks this Court to provide the following relief:

    a.    Enter judgment for Plaintiff on all counts.

b. Require Defendants to take appropriate steps to ensure that better training, policies, and equipment is in place to prevent future violations.

c. Award damages for any and all other monetary and non-monetary losses suffered by Plaintiff in an amount to be determined at trial.

d. Award punitive damages to Plaintiff.

e. Award Plaintiff his costs of litigation, including but not limited to attorney's fees, costs of suit, and prejudgment interest.

f. Such other relief as the Court deems just and proper.

## JURY DEMAND

The plaintiff demands trial by jury on all issues so triable.

Dated: December 8, 2025

Respectfully submitted,

VITT & NUNAN, PLC

By: /s/ Geoffrey J. Vitt
Geoffrey J. Vitt
Sarah Nunan
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055-1229
(802) 649-5700
gvitt@vittnunanlaw.com
snunan@vittnunanlaw.com